## WESTINGHOUSE ELECTRIC & MFG. CO. v. WAGNER ELECTRIC MFG. CO.

(District Court, E. D. Missouri. January 21, 1918.)

No. 4457.

1. PATENTS ⬡⟹324(5)—ACCOUNTING FOR PROFITS OF INFRINGEMENT.
   The District Court, on exceptions to the report of a master finding the profits made by an infringer, is not bound by the rule that such findings have the weight of the special verdict of a jury, regardless of the substantial equities of the case.

2. PATENTS ⬡⟹322—INFRINGEMENT—ACCOUNTING FOR PROFITS.
   The findings of a master as to the profits made by a defendant from infringement disapproved and the amount substantially reduced.

In Equity. Suit by the Westinghouse Electric & Manufacturing Company against the Wagner Electric Manufacturing Company. On defendant's exceptions to report of master on accounting. Sustained in part.

Paul Bakewell, of St. Louis, Mo., and Thos. B. Kerr, of New York City, for complainant.

Melville Church, of Washington, D. C., and Edwin E. Huffman, of St. Louis, Mo., for defendant.

DYER, District Judge. The litigation in this case has extended over a period of more than 15 years, and has been before this court and the appellate courts several times. The original suit brought by the complainant against the defendant was a bill in equity alleging infringement of United States patent No. 366,362, granted to Westinghouse. The particular claim of the patent alleged to have been infringed was claim 4. That claim is as follows:

"4. The combination, substantially as described, of an electric converter constructed with open spaces in its core, an enclosing case, and a nonconducting fluid or gas in said case adapted to circulate through said spaces and about the converter."

The claim having been therefore adjudicated in the Second circuit ([C. C.] 112 Fed. 417, and 117 Fed. 495, 55 C. C. A. 230), a preliminary injunction was consented to by defendant here ([C. C.] 129 Fed. loc. cit. 609). The issue of infringement as to special types of construction, notably the Type M transformer, was vigorously contested upon a contempt proceeding (unreported opinion by Judge Amidon), and upon final hearing in the Circuit Court (129 Fed. 604), and upon

---

⬡⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

appeal from accounting decree (173 Fed. 361, 97 C. C. A. 621). The case proceeded to an accounting in the Circuit Court, and the complainant electing to take profits in lieu of damages, the master, H. H. Denison, Esq., returned an award of $132,433.35. That report was disapproved by the court, and a decree for nominal damages and costs entered. That decree was affirmed by the Circuit Court of Appeals. 173 Fed. 361, 97 C. C. A. 621. Upon certiorari the Supreme Court (225 U. S. 604, 32 Sup. Ct. 391, 56 L. Ed. 1222) reversed and remanded the case for a hearing de novo upon accounting. The matter went again to the same master (Denison) who again found the profits to be $132,433.35. This court reduced the award to $10,000 (218 Fed. 646), and entered a decree for that amount. This decree was reversed by the Circuit Court of Appeals, as I understand it, for failure of the master to give due weight to the additional evidence offered by the defendant on that (second) accounting, and the case was again remanded for an additional report "showing the basis and constituents of the award which is recommended." This court then appointed James L. Hopkins, Esq., master, who has returned an award of $182,394.59.

[1] To hold and sustain this report the complainant urges upon the court consideration of the rule that accords to the findings of a master the degree of weight and of conclusiveness which is carried by the special verdict of a jury. The attitude of the complainant in this particular must be somewhat embarrassing to it, in view of the claim made by it on the first accounting. Considering the prior course of this litigation, and the large monetary interests involved, the court will not permit its own judgment to be defeated by blindly adhering to the rule now so strenuously invoked by complainant. If such contention be allowed, it would amount to a positive mandate to judgment, regardless of the substantial equities of the cause. This court is not to be more irrevocably bound by the rule invoked than the appellate tribunals which have heard the same matters, particularly in view of the fact that the present master considered only the printed record, and none of the witnesses testified before him orally.

Finally, and somewhat by way of reductio ad absurdum, this court has had presented to it in the course of this very accounting three separate reports of profits. These reports emanate from two different masters; the first two by Mr. Denison, and the last one (now being considered) by Mr. Hopkins. In stating the amount of profits, there is a difference of $50,000. Such a difference is confusing, when the two results are ascertained from one and the same record.

It may be suggested that the master making the second report avowedly took no real cognizance of the new evidence offered at the time of the second hearing, but that the master (Denison) considered only the proofs of the first reference, and therefore naturally followed his findings made upon the first reference. Assuming this to be true, we are then confronted with a further marvel, namely, that the defendant, being the only party to introduce proofs on the second reference, has, as the fruits of such evidence, plunged itself from an award of $132,433.35 to an award of $182,394.59. It therefore de-

volves upon this court to carefully consider the entire record before entering a judgment.

It may be stated that the decisions above referred to conclusively adjudicate the validity of claim 4, and determine the fact of its infringement by oil-filled transformers having core spaces. Obviously, such validity carried with it a determination that the device possesses patentable utility. But the latter phrase may only be taken to imply that the device will function or operate, and is to be distinguished from commercial value; for it will be readily seen that the fact of the device being operable will not necessarily lend its practical commercial value in possible competition with noninfringing, but economically superior, constructions. Nor, upon the finding that the device does possibly possess some commercial value, does it follow that the entire value, and therefore the entire profits, are derived from and to be attributed to the infringement. The Circuit Court of Appeals has determined the scope of the invention to be that of "a limited, detailed claim"; and the opinion of the Supreme Court seems to recognize the probability that the great mechanical desideratum is keeping the coils, not the core, from overheating, and that possibly the commercial value of so narrow a claim as this one has been determined to be is therefore slight.

[2] The issues raised upon the present accounting naturally resolve themselves into three inquiries, viz.: (1) What infringing transformers were sold by the defendant during the accounting period, and their value? (2) What profits were realized by defendant from such sales? (3) What portion of such profits were attributable to the infringement? These inquiries will be briefly considered in the order just stated.

I. It will be remembered that upon the first accounting there was offered in evidence a tabulation of defendant's transformer sales, thereafter known as the "Layman Schedule," and which was prepared by a representative of the master working with one of the clerks of the defendant. Mr. Layman testified that, while he had not done the work himself, he believed it to be correct as a statement, by items, of the infringing transformers sold by the defendant. Subsequently it was discovered that, instead of being a list only of infringing transformers, it was one that included practically all transformers, and, embraced many that by reason of their being dry (not oil-filled) or of their having no spacing wedges in the core (no core spaces) were plainly noninfringing within the scope of the claim as construed by the above-mentioned adjudications. The master upon that accounting, and upon the second accounting, held that the defendant was conclusively bound by the "Layman Schedule" as an admission. This view has been disapproved by this court, and, it seems to me, by the reviewing tribunal.

Upon the second accounting the defendant employed a certified public accountant to compile from its books a new schedule, designed purposely to embrace all transformers, so that selection might intelligently be made therefrom of those that were of the infringing construction. This list is known in the record as the "Williams Schedule,"

and it appears from an examination thereof that the defendant was at all times correct in its contention that the "Layman Schedule," while purporting to contain only the offending devices did in fact substantially embrace all. The complainant objected to the "Williams Schedule" as incompetent at the time of its introduction, and now continues to press the point, although seeking to have sustained the report of the present master, who adopts it as a basis for his findings. In the view taken by the court the two schedules seem to verify each other, considering the aims with which and the circumstances under which they were prepared. Since the "Williams Schedule" is somewhat the more comprehensive of the two, and since the finding most favorable to complainant has been drawn therefrom, it would not seem to lie in the mouth of the complainant to protest against its adoption as the basis of the inquiry, especially since complainant's contention that the "Layman Schedule" is infallible and unimpeachable on grounds of estoppel has been dissipated by the opinion of the Circuit Court of Appeals on the second appeal. From the "Williams Schedule" the present master has drawn a statement by machine types of those machines that infringed and those that did not. A discussion of his findings and of the evidence as to the various types would prolong this opinion to many times the length necessary. Suffice it to say that his exclusion of types SG, SH, and SK, for transformers above 15 K. W. capacity is evidently erroneous, and that no satisfactory reason appears for his inclusion as infringers of types M Arc and others ranging below 15 K. W. The same subject was considered by the court upon the same record at the last accounting, and upon re-presentation of the case the court sees no reason to change, but is rather confirmed in the finding then made, to the effect that the net amount received from the sale of infringing transformers did not exceed $308,128.77.

Since the complainant urges that solemn weight and import be given to the findings of a master, it may not be inappropriate to accord some respect to the findings of the court upon the same record. These matters of inclusion or exclusion of machine types from the category of infringers have necessarily had to be determined from the testimony of witnesses employed at one time or other by defendant, since they alone knew the details of type construction at remote periods, and it is particularly difficult to follow the course of the present master's reasoning when he apparently follows and accepts their testimony for the rejection of certain types, but rejects and discredits like testimony regarding others. The court sees no valid justification for the reflections cast by the master's report upon credibility of Messrs. Layman, Schwedtmann, Selling, and others, called as witnesses for defendant.

II. The question of the method of computing profits, even when the number and selling price of infringing machines had been fixed, has proven the most troublesome and difficult matter in the entire inquiry.

The first master exhaustively analyzed figures bearing on cost of labor, material, and overhead factory expense; but the Supreme Court found the record not in condition for the entry of a decree. The present master has attempted to cut the knot by simply adopting the per-

centage of desired profits, namely, 25 per cent. on factory cost, or its equivalent, 20 per cent. on selling price. It is not clear to the court from the testimony of witness Foster that he was acquainted with the percentage of normal or desired profit throughout the accounting period, nor that the said percentage of "healthy" profit recognized by Mr. Layman as desirable was in fact obtained when the transformers were sold in a competitive market. In fact, this seems quite impossible, when we consider the showing made by Accountant Williams to the effect that, even rejecting unusual losses, the entire profit of the company's business was but $64,154.72. The complainant has had the opportunity and must surely be in command of the facilities necessary to produce some contradiction or refutation of this expert's analysis of the defendant's financial affairs, and, failing such showing, the court accepts this figure of total profit as correct. Prorating the total profit sought in the same proportion that the total business of the company, $2,156,770.90, bears to the volume of infringing transformers sales, $308,128.77, we find the total infringing transformer profit to have been not more than $9,174.12.

III. If it has proven difficult to determine the total profits made upon sales of infringing transformers, it is certainly not less so to find what part of those profits was due to the infringement. The defendant contends with much earnestness and force that, since infringing and noninfringing transformers of the same type were sold side by side, with equal facility, at the same prices, sometimes to the same customer, without advertisement of the infringing feature, and without the customer ·knowing or caring whether any machine he bought had core spaces or not, therefore no part of the salability of the transformer was created by the infringement, and no part of the profit is attributable thereto. The defendant concedes, however, that the creation of the core spaces arose from the omission of iron, and that there was a consequent saving in cost of production, not exceeding 1 per cent. or $3,081.28, on the total infringing sales. Throughout this record the court has been impressed with the view that the cooling feature is due rather to the spaces in the coils, and between the coils and the core, than to the spaces in the core itself. The facility with which the defendant, after the decision of the Carbide Case, closed up the core spaces without crippling the efficiency of the device, as well as the series of Fynn-Langsdorf tests, serves to corroborate this view. The subject is not, however, clear beyond disputation, and certain expressions in the opinion of the Supreme Court appear to accord to the subject-matter of claim 4 a value in the art beyond that just indicated. In view of the fact that the burden of apportionment rests upon the defendant, the court resolves its doubt against that party, and gives complainant a decree for the total profits found to have been realized upon sales of infringing transformers, namely, $9,174.12.

Touching the question of the allowance of interest, it appears to the court that the contest as to whether complainant was entitled to recover anything more than nominal damages was a matter "in earnest controversy and of uncertain issue" (Tilghman v. Proctor, 125 U. S. loc. cit. 161, 8 Sup. Ct. 894, 31 L. Ed. 664), up to December 5, 1914,

the date of entry of decree of this court awarding to complainant substantial profits. The decree will therefore carry interest at 6 per cent. from said date.

The costs incurred prior to said decree of December 5, 1914, were specifically adjudged. Both parties appealed from that decree and were sent to another accounting. Complainant having failed to improve its position, and having likewise suffered no considerable impairment in the amount of its award, the costs since said decree are assessed against the parties. It follows that the defendant's exceptions to the master's report are sustained in part and overruled in part, as indicated in the course of this opinion (but without taxation of costs against either party under equity rule 67 [198 Fed. xxxvii, 115 C. C. A. xxxvii]), and that a decree may be drawn and entered in conformity herewith.

It is so ordered.